We will hear argument first this morning in Case 12-515, Michigan v. Bay Mills Indian Community. Mr. Bursch. Thank you, Mr. Chief Justice, and may it please the Court. After Bay Mills' concession on the first question presented, the only issue is whether Bay Mills enjoys blanket immunity from suit when it engages in illegal, off-reservation commercial conduct. And the answer is no for at least two reasons. First, it makes no sense that Congress intended States to have a Federal injunctive remedy for illegal gaming on reservation, but no injunctive remedy if that gaming takes place on land that is subject to the State's exclusive jurisdiction. Second, tribes should not have greater immunity than foreign nations. There is no dispute that if France opened up an illegal business in Michigan, casino or otherwise, it would have no blanket immunity. Counsel, before you go on, could you address the jurisdiction question for me? I'm not sure why you're here. The only injunction that I see was entered on behalf of Little Traverses and not on behalf of the State. And so the counts that you're arguing about were added after the injunction was issued. How do you have jurisdiction to add to argue someone else's injunction? That's not quite correct, Justice Sotomayor. Originally, this case was filed as two separate lawsuits. Michigan was a plaintiff and then the other tribe was a plaintiff in a separate case. Those cases were consolidated. And then when the motion for injunction was filed, Michigan joined in that motion, filed a brief supporting it, and everyone proceeded under the assumption that both the tribe and the State were asking for the injunction. That, in fact, is not what the district court said. The district court explicitly said in its order granting the injunction that the State hadn't filed an injunction, hadn't intervened, and had only filed supporting papers in support of Little Traverses' case. I'm a little – I'm very, very confused as I look at what the district court said. It explicitly said you weren't part of the order. Well, again, they were consolidated cases. We were supporting the injunction. Sotomayor, I think consolidated can have two meanings, and to be heard together or to be joined together. I don't think the district court understood that this was going to be joined together. Why did it say what it did? Well, I think it was everybody's understanding that these were joined together because the parties were pursuing the exact same issues. And so then once this went up to the Sixth Circuit, there was no question in the Sixth Circuit's mind. Sotomayor, if you didn't file an injunction, why did your brief say that you filed it only in support of Little Traverse and not on your own behalf? Because once the cases were consolidated, and at that point we were even using the same docket entries, there was already a motion on file. And so there was no need to have a second motion. It was clear to everyone that the State of Michigan and the tribe were both pursuing that injunctive relief together. And that's exactly the way the Sixth Circuit treated it. Sotomayor, I'll ask your opposition, but I don't see why the district court would have made the point it did if it believed that it was dealing with both of you as parties. Well, everyone has proceeded up the chain, including in the Sixth Circuit opinion, on the assumption that it was consolidated, that Michigan was requesting an injunction. And in fact, that kind of a procedural objection has never been raised by anybody, certainly not at the petition stage. No, but we have to, if we're not sure, raise any jurisdictional issue. Sure. But I think it was eminently clear to the Sixth Circuit, if you read its opinion, that these were consolidated. Well, it wasn't eminently clear to the district court who entered the order. Is that a jurisdictional objection or a procedural one? Your Honor, it's a procedural objection. The only jurisdictional question in this case is whether there's Federal question jurisdiction under 1331, which has been conceded, and the United States agrees to that. And so I'm not going to spend my time on that. Where I would like to spend my time is on the scope of tribal immunity. Ginsburg. Before you do that, can you tell us why Michigan didn't resort to the dispute resolution means that the compact provided? The compact said if there's a dispute, it will be decided by arbitration. Michigan bypassed that? That's correct, Justice Ginsburg, and there were two reasons for that. The first is that that provision was only discretionary, as we explain in our reply brief. But even more important, the compact also makes clear that the tribe did not waive its sovereign immunity for purposes of arbitration. So if we had gone to arbitration and prevailed, if the arbitrator had reached the same result as the Federal Government did as to the status of these lands being not Indian lands, then the tribe would have been able to resolve the dispute. I'm sorry. Could you explain that? Because I thought that the purpose of the whole point of the CNL Enterprises case is to say that when a tribe agrees to arbitration, it has waived its sovereign immunity for that purpose in that proceeding. Are you saying that there was something special? I am. Disagreement? Justice Kagan, and I'm glad you brought up CNNL, because there you had a construction contract where there was invocation of an arbitration remedy and it didn't specifically preserve tribal immunity. Here we have the exact opposite. In the same paragraph 7 of the compact where we have the arbitration provision, the tribe and the State agree that notwithstanding the arbitration provision, both parties' sovereign immunity is not waived and that it's preserved. So if we took a successful arbitration judgment and then tried to reduce that to a Federal judgment in court, they would have asserted immunity and we would be in the exact same procedural posture that we are right now talking about the scope of tribal immunity involving illegal off-reservation gaming. Why did the — along the same lines, why did you assert sovereign immunity as a defense when the tribe brought a declaratory judgment action concerning the status of those lands? Because, again, it wouldn't have done any good for us to stipulate to jurisdiction on the tribe's claim about the status of the lands, because simply having a declaratory judgment wouldn't have given us any relief. We would have had to file a counterclaim for injunctive relief and the tribe undoubtedly would have filed or would have asserted a tribal immunity there as well. So really, all roads lead to tribal immunity, no matter how you see it. Sotomayor, all roads lead to one issue, I think. If you had gotten a declaratory judgment, they would have had to stop their gaming activity. No. But you wouldn't have gotten their property. Isn't that what this suit is about, you trying to take over the casino? No, we don't want to take over the casino. We want to stop illegal gaming on lands subject to Michigan's exclusive jurisdiction. So why not ex parte Younger? You point to one or two cases in the lower courts that suggest there might not be ex parte Younger jurisdiction, but those cases are distinguishable. So why not go after just the officials? Two responses to that, Justice Sotomayor. One, kind of a practical consideration, and then one, a broader Federalism principle that I want to emphasize. The narrow practical point is that ex parte Young is an imperfect remedy for lots of reasons, as we express in the brief. It's well settled that you can't get specific performance of a contract, you can't enforce State law in Federal court, you can't get money or seize assets in ex parte Young action, and that's why lower courts do that. Sotomayor, all you wanted to do was stop them from doing the gaming casino. You would have gotten that. It's not clear at all to us that we would be able to get that relief based on the lower court holdings. Now, the bigger sovereignty point is that if a foreign country, if France or Haiti came in and opened the same casino, the State would have the full panoply of remedies available to it, and it should have those remedies, because any additional immunity you give to the tribe when it's engaging in illegal conduct on land subject to Michigan's exclusive jurisdiction, you are necessarily taking away from the sovereign authority of the State of Michigan. You are giving us a less remedy. Ginsburg. All that, the enigma that you pointed out, the anomaly, is certainly clear. But what about Kiowa? This Court seemed to say that the tribe is immune. Palm reservation, oak reservation, commercial activity, government activity, it is immune, blanket immunity. So how can you prevail without having this Court modify Kiowa? Here's how, Justice Ginsburg. Because Kiowa involved a private party plaintiff. It did not involve a sovereign State. And this Court has stated repeatedly that States are different. We are constitutional sovereigns, and so we aren't treated like ordinary business plaintiffs. In that case, the fact that the plaintiff could not enforce this promissory note did not directly implicate a State police power. Here we're talking about the authority. Kennedy. What's your best case for that proposition? For the proposition that States are different? That States have a lesser burden when they're faced with a sovereign immunity defense? I wouldn't say that it's a lesser burden, but I think you need to analyze this as a zero-sum game. That when you're talking about activity taking place on sovereign State land and you're not allowing the State to have its whole panoply of remedies, that you've taken away an attribute of sovereignty that would have existed. What's your best case for that? I would basically just cite all the cases this Court has decided over the last quarter century involving the ADA, the ADEA, where this Court has consistently recognized that States are different. Sovereigns. That's a big reading assignment. Breyer. The question is this. Three situations. I think it's the same question Justice Kennedy was driving at. One, France opens up a casino. Yes. Two, California opens up a casino. Yes. Three, an Indian tribe opens up a casino. Correct. Okay? Now, what is it that says that the State where the casino is located can sue France? What is it that says it can sue California? All they all object. What is it that says it can sue the Indian tribe? Thank you, Justice Breyer. And, Justice Kennedy, hopefully this will reduce the reading assignment. The case that says we can sue France is Alfred Dunhill, which was this Court's decision that first recognized the commercial distinction for foreign nation immunity. Now, Congress was at a statute or common law? That was common law, common law development in Alfred Dunhill. Now, shortly after that, Congress did enact the Foreign Sovereign Immunities Act, which essentially codified this Court's common law rule. And once that happens, then the common law development. Okay. California? So California, the case is Nevada v. Hall, in which this case said that a State's sovereign immunity from suit does not extend when it's got actors in another State. There, Nevada's agent was acting in California, and the Court held that that actor could be liable for suit in California. Okay. All those are common law, both?  Well, that's the thing. The State, Kiowa or Kiowa, did not involve a State as sovereign. It involved a private business plaintiff, and it's distinguishable on that basis. And if you disagree with me and you think that sovereign States should be treated the same way as private party plaintiffs, then we would ask you to overrule that part of Kiowa, which suggested that tribes can engage in illegal commercial conduct on land subject to exclusive State jurisdiction without any right. But I think this is what Justice Kennedy was getting at when he asked you for a case, because what you're saying now is that when the State is the plaintiff, the sovereign immunity of the tribe disappears. So so. Well, not disappears, but it disappears when they move off reservation and they're acting in a commercial capacity. So what, I guess, what's the case that would suggest that when the plaintiff shifts, the sovereign immunity goes away? And this Court's case that would suggest that is the Oklahoma Tax Commission case, because that was a case where a State, not exercising a police power, but one of its lesser powers, the power of taxation, was attempting to tax cigarettes that were being sold on Indian trust land by a tribe. And in that case, the Court acknowledged that even on trust land, so this isn't on land that's subject to State exclusive jurisdiction, that the State would be able to tax those cigarettes being sold to non-tribal members. Breyer. But the question specifically, then, I think we're driving at the same thing, is the – remember, you just cited to me two cases, one involving France, one involving California. And I had assumed, but maybe I was wrong to assume, that when I read those cases, I will see, although a State can sue France, although Nevada can sue California, a private individual could not. Am I going to find that when I read those two cases? Now I think the answer, Justice Kagan, is I'm not going to find it. So we're looking for authority, back to Justice Kennedy, that will support your proposition that the State could sue France, Nevada could sue California, but a private individual could not. I think the Oklahoma Tax Commission case would be the closest, because even if you had a private individual who was trying to sue a tribe for conduct that was taking  Now, what you're asking us to do, then, if the answer is what I now think you're saying, is to say it's awfully complicated that although a State could sue an Indian tribe for something that is outside the reservation, the State – it's so complicated that I'd like some good authority for it, because a private person couldn't, but a State could sue, and it's only in certain places. Well, there's lots of places that you could draw the line in this case. If you – I'm drawing the line with Kiowa, right? Well, here's what I'm going to suggest. Nine justices in Kiowa, both the majority and the dissent, recognized that there were substantial issues with applying tribal immunity on or off reservation in the commercial context. This Court had done away with that for foreign nations in Alfred Dunhill. It decided to give Congress one more chance in Kiowa, but left the question open for further common law development. But Congress didn't respond. The majority opinion in Kiowa – I don't know if it's Kiowa or Kiowa – said, you know, this is an unfortunate result, but Congress can do something about it. Well, now Congress hasn't done anything about it, and you are asking this Court essentially to modify the – that precedent. I am. I mean, I don't think you need to modify it. I think you could distinguish it based on the fact that there's a private party plaintiff there. But if you feel otherwise, that you need to modify it in order to rule in our favor, it's totally within your power. As we explain at length in the context of foreign nation sovereign immunity, it's a body of common law that this Court is free to modify as appropriate. Alitoso, why is that important? Why is the issue that you brought before us important? In addition to the possibility of an Ex parte Young action, you could certainly arrest people who are running what you believe is an illegal casino in the State, can't you? Well, there are at least two reasons why that is also an imperfect remedy. The most obvious one is that it creates exactly the kind of inner sovereign conflict that Congress was trying to avoid when it allowed under IGRA for States to get injunctions even for on-reservation contracts. In addition to that, couldn't you have stopped this before it even started by insisting in the compact that the tribe waive sovereign immunity? Well, that's a great question, and the answer to that is twofold. First, when the compact was negotiated back in 1993, this Court had not decided in Kiowa. That came five years later in 1998. And so Congress and the States reasonably assumed at that time that if a tribe was engaged in illegal commercial conduct off-reservation, that of course a State would have the ability to do it. Well, going forward, Justice Alito, I think this is Justice Alito's question. I don't mean to interrupt. Why couldn't you say that it's a matter of compact interpretation whether these are Indian lands? A matter of compact interpretation whether these are Indian lands. So you go to Federal court to interpret the contract, there's no immunity has been waived, and you say these are not Indian lands. I think that's what Justice Alito was asking. I didn't mean to interrupt him. I didn't get quite the same question from Justice Alito. A more sophisticated version of my question. No, seriously, that's into a more difficult issue. Right. Well, if I can finish answering Justice Alito's question, you asked why we can't just go in and arrest. And the second answer to that, besides the conflict of going in with armed police guards and arresting Tribal officials and hauling them off to county jail, which Congress tried to avoid when it enacted IGRA in the first place, that's what everybody wanted, again, it's limiting State sovereignty. Well, I understand that, but going forward, is this of any importance? Why? Oh, there seems to be a Tribe wants to open a casino, and the State has to have a compact with the State. Isn't all the bargaining power on the side of the State, so the State says, fine, if you want to do that, you have to waive sovereign immunity? Well, we had a compact in place in 1993 that limited their casinos. But going forward, but let me give you a very practical answer to that question. This compact in 1993 had a 20-year term on it, and so it essentially expired at the end of November, just a few days ago, although it has an evergreen clause that allows it to continue while the parties try to negotiate a new compact. And as you would imagine, the very first thing Michigan asked for in its proposed amended compact was to waive Tribal sovereign immunity to deal with issues like this. And unsurprisingly, the Tribe said, we're really not interested in that. We kind of like the way the sovereignty issue is preserved in the existing compact. Now, the question about whether this has an impact beyond Tribal gaming, the answer is no. But if I could just pursue that. Sure. So the compact has expired, and there's so then how can they operate the casino? Well, it hasn't expired. Until the parties complete. Until they reach a new compact. Until they reach a new compact, it continues in effect. And is the status of the land, is Indian lands determined by the compact? No, it's not determined by the compact. It would be determined as a matter of Federal law. That's the Federal question in this case. And it's. But the compact refers to Indian lands. Surely you could take the position that there is a waiver of immunity to determine whether or not these are Indian lands under the compact. I don't think we could, respectfully, Justice Kennedy, because the compact does not envision that the tribe has waived immunity for any purposes. If you look at section 7 of the compact, it's really unequivocal about the tribe not waiving immunity. Could I ask you a question? What would happen if this were Indian lands, and they went ahead and did exactly what they did? There was no dispute that these were Indian lands. Would you have had grounds to object to them building a casino on these lands? We would not. You would not? Correct. If these are Indian lands, then it's permissible under IGRA and under the compact for them to have and operate a casino. All right. The issue of what constitutes Indian lands is between the Federal Government and the Indians, pursuant to the land trust settlement, correct? I disagree with that, because. I know you do, and I know why you do. But what defines the lands is the settlement trust, correct? Federal court interpretation of the Michigan Indian Land Claims Settlement Act, yes, would determine the status of these lands. The reason why it's not just between the tribe and the Federal Government is because Michigan has a huge interest in having lands that are currently under its exclusive sovereign jurisdiction be determined to be Indian lands where they lack the regulatory authority. Sotomayor, on the other side of gambling, let's assume that it was just their buying this land. Yes. Could you have stopped the buying of this land or unraveled it? Didn't we have a recent decision that said no? If you're referring to the Patchett case. Yes. In that case, you held that the plaintiff could, quite a bit after the fact, file a lawsuit to unravel that transaction if the lands were not eligible for Indian gaming, if I'm remembering the holding correctly. And Michigan does have a substantial interest, not just in the gaming context. And I do have to follow, if you were going to object to this land being taken into the land trust, wouldn't you have had to follow the administrative process? We would, but the land has never been taken in trust. Even the Federal Government, the National Indian Gaming Commission, has concluded that these are not Indian lands for purposes of the Settlement Act. And so we never got to the point where they got in Patchett where they went through the administrative process to take the lands in trust. Kagan. General, if I could assume that this is not Indian lands, and just ask why you need for sovereign immunity to go away. And so you have the ability to arrest people. You have the ability to bring ex parte young actions. Presumably, you have the ability on non-Indian lands simply to shut down a casino. Presumably, you have the ability on non-Indian lands to condition any licensing of a casino on whatever you want. I guess the question is, on non-Indian lands, you have a thousand ways to stop a casino that you don't want. Why do you need the abrogation of sovereign immunity? Because we try to take the least intrusive means necessary to stop the casino, to not go in with the billy clubs and the guns and to arrest Tribal members. I think all of our cases suggest that sovereign immunity is quite important to a sovereign's dignity, and that it's not nothing to abrogate sovereign immunity. And so you can say, well, you know, that would be less intrusive than all these other things, bringing ex parte young suits, arresting people, just, you know, conditioning a license, stopping the casino from operating. But, you know, I suspect that the sovereign tribe here would say that, no, it's an affront to their sovereignty to take, to strip them of sovereign immunity, and none of these other options that you have are that. Right. But, again, arresting the other sovereign's officers is, with all respect, not respectful to the tribe, which is why that's the course we pursued. And the change we're asking for here is not as big as the tribe makes it seem, because in IGRA, Section 2710, we have the ability to get an injunction to stop illegal gaming taking place on reservation. And so it's really not that big a leap to say if they're engaging in illegal gaming off reservation, likewise there we should be able to get the least intrusive remedy, the one that is most respectful of the tribe's sovereignty. And, frankly, we're kind of surprised that the United States would take the position that we're better off going in and arresting or suing individual officers, because that's not the way sovereigns are supposed to interact. And it would be a big deal if France opened up a casino in Michigan, and rather than seeking a civil injunction, we tried to arrest the French President and throw them in a Michigan jail. Alito Is it not correct that the people who work in these casinos are just employees? They have no other connection with the tribe. Am I wrong on that? I believe some of the employees are tribal members, some are not. And we cite a number of cases in our reply brief where tribal immunity has been extended to tribal employees, whether they are members of the tribe or not. Can you prosecute people who frequent this illegal casino? Sue Michigan citizens? Yes, we could do that. But, you know, again, I want you to understand the scope of the invasion of the State's sovereignty here. If any other entity, foreign nation, another State, an individual, set up an illegal business, whether it's prostitution, underage drinking, gaming, you name it, we would have the full panoply of State civil and criminal regulatory remedies available to us and could pick the most appropriate one. And somehow, because this is a tribe, even though they are operating on Michigan's land where we have exclusive regulatory jurisdiction, somehow all those remedies are circumscribed to imperfect remedies like Ex parte Young, which may or may not be successful, or arresting our own citizens. And that's not respecting the constitutional sovereignty that Michigan represents in this case. And to get back to a question a number of you had about the implications of this aside from gaming, this happens in all kinds of other contexts off-reservation. You just had a case in 2011 involving the Oneida tribe in New York, where they failed to pay their property taxes in New York, and so the State moved in to foreclose for nonpayment of taxes those off-reservation properties. And the Second Circuit, interpreting Kiowa, reluctantly concluded that the State did not have the ability to enforce by foreclosing on that property because the tribe had immunity, and invited this Court to review Kiowa. This Court granted cert. Eventually, cert was dismissed because the tribe waived immunity, and they were able to go forward and pursue that remedy. But, you know, whether it's in the tax context, whether it's the gaming context, whether it's criminal context, you know, the amici briefs of Oklahoma and Alabama are replete with the issues that they're having as sovereigns in running up against the tribal sovereign immunity when it comes to these contexts. If there are no further questions, I will reserve the balance of my time. Roberts. Thank you, counsel. Mr. Katyal. Katyal. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to begin where my friend did not, with the text of the statute. Congress enacted subsection A-2, like the rest of IGRA, to address gaming solely on Indian lands. In fact, Congress used that phrase, on Indian lands, a whopping 24 times in IGRA. By contrast, IGRA says not a word about off-Indian lands activities. Scalia. You think Congress really wanted the States to have power to stop illegal gambling on Indian lands, but not to have the power to stop illegal gambling on State lands? Is that the law you think Congress wrote? I do think so. And if I could say first of all why would anybody want to? I have two reasons, Your Honor, why I think Congress made the choice they did. But even before that, I don't think that's the proper inquiry for this Court. The proper inquiry for this Court, as C&L and other cases have said, is it requires an unequivocal expression of purpose of Congress before tribal immunity is abrogated. And we don't get into this kind of question of what Congress might have thought, which creates a guessing game. But just to answer your question, why would Congress have thought this? Do you think that rule would apply even when, at the time the statute in question was enacted, there was no belief that there was tribal immunity on State lands? Boy, Your Honor, I know my friend on the other side has said that. That's just flatly wrong. Puyallup in 1977, Your Honor, precisely said that it involved both on and off-reservation activity, it was commercial activity, it was fishing, and this Court said that tribal immunity was not an issue, so I do think that's not the proper inquiry for this Court. Scalia, I thought that was just on-reservation. Do you think that was off-reservation? It is. On page 167, Your Honor, it says that the injunction is both on and off-reservation. And then in Kiowa, page 754, this Court made clear that that's how it read the case. Kiowa is later, of course. Of course. But I think that Congress, in enacting it in 1988, certainly was under the same set of assumptions as this Court in the Kiowa case. And you think they read Puyallup that closely? Well, I think it's several places in Puyallup, and certainly that's what this Court in Kiowa said. And I do think the text is the best guide to what Congress wanted. And the text uses on Indian lands 24 times. And the reason for that, the reason why there's not an absurdity, is twofold. First, Congress in IGRA was reacting to this Court's decision in Cabazon the year earlier, which had ousted State court ‑‑ State regulatory jurisdiction entirely from on Indian lands activity. So it changed the game entirely. Cabazon did nothing with respect to off Indian lands activity. It left entirely intact all the remedies we've been talking about, Justice Alito's remedy, about criminal sanctions. You agree with that, that they could ‑‑ the State could go in and arrest all the customers that are gambling there? Could it seize the slot machines? Well, it certainly could arrest the customers, employees, and so on. And that's why we would not operate this casino without a square ruling. And it is shuttered, Justice Alito, right now, because we need a square ruling that says this is on Indian lands activity. We would like that. But you don't have a square ruling. So I want to make clear, because both you and the Solicitor General have suggested this as an option. You think it is all right for the State to go in and arrest every employee, management, you know, labor, who's participating in this casino, and subject them to criminal sanctions, civil penalties, and an injunction. You've got no problem with that. We think that that's a consequence of tribal immunity, that when you're ‑‑ when they are seeking relief qua tribe, that's a different thing. And that's, I think, a standard principle in 11th Amendment. But you as a tribe would have no objection to that? Well, Your Honor, I think if that circumstance unfolded, we might say let's try and figure out a different way to deal with that. First, of course, the most primary way is the compact itself. And many compacts, for example, have arbitration clauses. Well, I know. You could suggest different ways, and the State could tell you, you know, go fly a kite. We're prosecuting these people. And you'd have no objection to that. Absolutely. You know, we're not here trying to say that we want to evade the law. We want a ruling, a definitive ruling. We believe very squarely that this is on Indian land's activity. And what about ex parte young? Are you willing to waive the tribe's sovereign immunity in an ex parte young action? Well, because in your opposition to the complaint, in this case you raised, you raised sovereign immunity as an objection to the ex parte young. Sure. Sure. As part of the district court, as part of ordinary discovery, as part of ordinary litigation, we said that ex parte young wasn't applicable. But we do think, and our brief in opposition said this, our merits brief says this, the United States brief says this, that ex parte young actions are available against tribes. Justice Sotomayor. But the factors are available that you would not assert sovereign immunity if they brought an ex parte young action. Well, Your Honor, we would not assert it to the limits of ex parte young. So, for example, ex parte young doesn't permit reaching into the State coffers. And here, count five of the complaint tries to reach into the Tribe's coffers. And so we do think that that type of ex parte young, that's not permitted by ex parte young, and that would be impermissible. If I could return to the second reason why I think what Congress did wasn't creating any sort of anomaly, like my friend says, the reason is this. All IGRA did in A-2 is empower compacts. It didn't abrogate immunity by itself directly. It requires the Tribe to affirmatively buy into the idea of State law applying on the reservation. So if we could, just imagine a casino, Justice Scalia, opened blatantly on a reservation, a casino without a compact, that was absolutely illegal. We'll call it Casino Red. A-2 would not abrogate immunity in that circumstance. The State would have no remedy. Kennedy, I thought the statute says that there's Federal court jurisdiction over any cause of action initiated by a State or Indian Tribe to enjoin gaming activity that's conducted in violation of the compact. On, yeah, on Indian land, exactly. And so my example of the casino here would be one. Why couldn't this? If there's no compact, Justice Kennedy, there's no abrogation. And so what A-2 does is it empowers the Tribe and the compact, and it requires the Tribe affirmatively to come in. And that's why off Indian land there is standard Tribal immunity, because the Tribe hasn't said anything in the way of the other. Kennedy, you don't think there that 1166 abrogates the immunity, which provides it for purposes of Federal law, all State laws are applicable? Yeah, not at all, Your Honor. All 1166 does is bring Federal – that's about Federal enforcement. Not at all about State enforcement. Indeed, Michigan's own position on Michigan's Supreme Court said 1166 is nothing with respect to State enforcement. Kennedy, you do not take the position that this casino in this case is part of a compact? Which casino? The casino in this case, in your view, is not subject to any compact, is not covered by any compact. No, we do. We think that the proper remedy here, if they had an objection, would have been to have Indian lands, Petition Appendix 77a and 78a, lay out the terms of the compact and what gaming is allowed. He says that if they arbitrated when they tried to enforce the arbitral judgment, you would assert sovereign immunity. Well, two responses to that, Your Honor. First, of course, that's the remedy they agreed to in the compact itself, and of course  And second, if they ask you to do it, you should try to do it. Well, I mean, that's not an answer. Well, it is an answer in the sense that, Your Honor, had they asked, we and I can tell you, I've discussed it with the Tribe, that they would, of course, not – they would, of course, not assert sovereign immunity to enforce the arbitration agreement.  Sotomayor, how do you win in an arbitration when the Gaming Commission has said it's not Indian lands? I mean, I'm actually not sure that the ruling of the district court was right on this, okay? But putting my own beliefs on or questions about that ruling, how do you win if the Federal Government has said it's not Indian lands? Well, we think that that isn't a final decision and is wrong for any number of reasons on the merits that, you know, it laid out in the joint appendix. And so we do think that would be the argument that we would make to the arbitration board. That should have been the remedy. But how does the arbitration board change the mind of the Gaming Commission? Aren't they the final deciders of whether this is trust land or not? Well, no, I think that – I think that that isn't itself a final decision, and there are any number of mechanisms that may be available to try and get the issue properly teed up to the NIGC. I don't see how an arbitration works. The Federal Government has a very keen interest in whether this is Indian land or not. And the arbitrator is going to decide that in a way that's going to bind anybody? Well, it would bind, I think, the parties before it, and that's what the parties agreed to. In many contexts – So an ongoing, as far as the tribe and the State is concerned, they proceed from then on as if this is Indian lands, even though the Federal Government is saying, no, it's not. Well, I think that we would still have to persuade the Federal Government in one way, shape, or form because of the NIGC's authority in this area. So I think there's separate questions. So the arbitration doesn't get – so the arbitration doesn't get you anywhere at all? Well, it at least resolves the issue with respect to Michigan. Our central point here is that there's lots of different ways to deal with this question, including the question you asked earlier, the declaratory judgment action which we brought against Michigan. There's lots of ways to resolve the underlying Indian lands question. The last thing I think this Court needs to do is entirely change the rules of the game with respect to tribal immunity. Ginsburg, what would be the big change other than modifying Kiowa, which is a divided opinion, and was dealing with a money claim? It wasn't dealing with injunctive relief. Well, certainly this Court's decision in Puyallup, as well as Oklahoma Tax Commission, both did deal with injunctive relief, and both were against States to deal with his argument. Now, he has said, my friend on the other side has said, well, look to the foreign sovereign immunity context, and that's what's giving him his reason for saying it wouldn't be such a big change. And we think that's wrong for two reasons. Number one, Kiowa itself at page 759 dealt with this and said that it was the political branches that led the change on commercial immunity, not this Court. And number two, my friend has quoted Alfred Dunhill, and I think that the everything about it. But is that right? The distinction between commercial and governmental, it was court-made in the first instance. And then the Foreign Sovereign Immunities Act codified law that was court-made. So it was the courts that made the distinction between acting in a commercial capacity and acting in a governmental capacity. Justice Ginsburg, the majority of Kiowa at page 759 responds to that and says that it was actually the political branches that led with the Tate-led policy. Breyer, it was wrong on that, apparently. That's what he says. It's wrong that if we look at the cases, what we will see is it was the courts that said there's a common law abrogation of France's sovereign immunity when they go into business in downtown Iowa. And just prior to that, the same thing with the State, he says, in Nevada and California and then he says it would be totally anonymous to think that an Indian tribe could go into downtown Des Moines and open up a clearly illegal business and you could sue France, the State, which was not Kiowa. They could sue France, the State could sue France, it could sue California, but it couldn't sue the Indian tribe. Justice Breyer, we would encourage the Court to look at precisely the case he is citing for this proposition, which is Alfred Dunhall, because as the case was vigorously argued by a Justice Department attorney, and what my friend doesn't tell you is that the pages he is citing actually don't command a majority of the Court. They are about not commercial immunity, they are not about foreign sovereign immunity, they are about active State immunity. Breyer, what about the California-Nevada? And the California v. Nevada, I think this Court dealt with in Kiowa itself, because in Kiowa it's – because that's about basically the State having to do with the individuals who are not the State. Yes, exactly. But I think this Court has recognized in Blatchford and in Kiowa that in Nevada v. Hall situations, which is what the dissent in Kiowa raised and what my friend is trying to resuscitate, that's a difference in circumstance because there was a mutuality of concession. All right. I'll look at those with care. But now, assuming you are right on that, is the question in front of us, on the assumption that these are Indian lands, does the Indian tribe have sovereign immunity? Is that the question you want answered? We think that, yes or no, that if they are on Indian lands, yes, there is. But you want us to say on that assumption – now, on that assumption, I look at Romanet 1 and number 2 under A, 7A, and a quick reading of them suggests to me that they can sue the State when the State won't open negotiations, and the State, or an Indian tribe, can sue the Indian tribe when the Indian tribe refuses to follow the Compact. What's your answer to that? When it's on Indian lands, exactly. Well, I know, but you said to decide this on the assumption that it's on Indian lands. If I make that assumption and then I look over and read Romanet 1 and Romanet 2, it sounds as if, as I said, Romanet 1, the tribe can sue the State to get the Compact going. Romanet 2, the State can sue the tribe when it violates the Compact. Your Honor, I may have misunderstood your earlier question, but certainly our position is that you can't look to our answer to determine whether or not there is tribal immunity in the case. That is not something my friend has argued. It's outside of the questions presented entirely, which both proceed on the assumption that this is off of Indian lands. Alito, for the purposes of sovereign immunity, does it make any difference that you have at least a colorable claim that this is on Indian lands? Well, I think that it's – I don't think it matters either way. Our position is one way or the other. Yeah. So if your client or another tribe just decided to go into the gaming business all over the country and began opening casinos in places that clearly are not Indian lands, you still would have sovereign immunity. Right. There would be tribal immunity for that, just as if the blatant casino on Indian lands opened a casino, a tribe opened a casino without a Compact. The State would not have an A-2 injunctive remedy, and that's why there is no anomaly. That's why I'm trying to get what question I'm supposed to answer. If I'm supposed to answer the sovereign immunity question on the assumption that these are Indian lands, contrary to what was decided below, I might get one answer. But if I'm supposed to do it on the assumption that they're not Indian lands, I might get a different answer. What assumption am I supposed to make? The latter, Your Honor, for two reasons. Number one, that's what the questions presented say. And number two, one of the most venerable precedents of this Court is Justice Holmes' opinion in Kohler Dye, which says you don't look to our answer to determine what happens. Sotomayor, what happens if you can't convince the Federal Government that these are Indian lands? And despite the Gaming Commission's final ruling, there's no other way to overturn it, you decide to operate the casino? It's not Indian lands by the Federal Government. You haven't convinced them otherwise. What occurs at that moment? Who can stop you and using what mechanism? Right? The Federal Government has a variety of mechanisms available to it in that circumstance, including closure orders and the like. And I suppose even the State may have any number of actions, both, you know, many States will have this worked out in the compact, but if they don't have it worked out in the compact, then there may be the possibility of criminal prosecution. Sotomayor, the compact only comes into play if it's Indian lands. But if the Federal Government has said it's not Indian lands, that's what I'm asking. Right. I think that still the State may have any number of criminal or civil remedies available to it. That is, off Indian lands, and this is why there isn't an anomaly in A2, off Indian lands, the State has a whole bunch of mechanisms available to it.  Mr. Gottlieb, isn't the difference, the State can really, can shut down these gambling operations easily if it's off Indian lands. What the State can't do is get any kind of damages or money remedies. Isn't that really the difference? I do think so. I think that that's, I think that that's underlying some of this, absolutely. Maybe that's an important difference. I mean, maybe we should give the State the ability to collect damages. Well, I certainly would disagree with the idea that you, the Court, should. I think the proper response would be exactly what this Court said in Kiowa, which is if there's a dispute about the contours of immunity, commercial, off land, State as plaintiff, all of that, those are all things that Congress is well-suited dealing with. Ginsburg. Mr. Kessler, isn't it odd to say that when this is the Court, the doctrine of tribal immunity is something that was announced by this Court. Congress never passed a law that says the tribes have immunity. It's all this Court. And then you say what this Court made, only Congress can unmake. That seems strange to me. Justice Ginsburg, that was precisely the argument that was made in Kiowa, was accepted by the dissent in Kiowa, but what the majority said is, really, Congress is best able to balance the rights, remedies, and reliance interests of the parties. And I'd note, picking up on your question to my friend earlier, that after Kiowa, Congress hasn't been silent. Congress has reaffirmed tribal immunity in the Patriot Act extension in 2005, in the Cigar Act of 2009. They've cut it back in the Arizona Water Act and the Zuni Acts of 2003. This is not a circumstance where they've cut it back. Kennedy, this is not such a changing position as to whether or not we're dealing with Federal lands here, or, pardon me, with Indian land. Maybe that's a reason that we should confine and limit Kiowa so that it doesn't apply to Indian gaming, and we won't have this problem. Well, I think that's the reason. Because I wanted to get the answer to Justice Breyer's question, is it your position that these are Indian lands? And I still don't understand your position. Our position is that's true. Then maybe this whole idea of immunity doesn't work very well in the context of gaming. Our position, Justice Kennedy, is that they are Indian lands, that there's lots of different remedies available both on and off Indian lands, and that this Court in Kiowa set out the way to deal with any sort of cutting back, which is to leave it to Congress. And I think we get what we're trying to do here. Go ahead. What remedy would a private person have? Suppose a patron of the casino was beaten up by casino employees. What remedy would that person have? I think what the Court should do is the same thing it did in Kiowa, which is bracket that question, because this is as far away from that as you can possibly get. Here, the State entered into a contract with its eyes open that not just didn't say anything about tribal immunity. It reaffirmed tribal immunity at Petition Appendix page 90. Now Michigan doesn't like the terms of that deal, and so they're coming and trying to renegotiate that now. So there may be, for the tort plain, if I understand, there may be any number of arguments available, but this is so far from that. We've talked about this prosecuting the employees. I suppose if you bring a criminal action against one of the employees, the State would have to prove beyond a reasonable doubt that this was not Indian lands? They would. They would. I'm not sure if it's not much of a — I'm not sure if for an element of that crime whether that piece of it would be beyond reasonable doubt. That may be an attendant circumstance and not subject to beyond reasonable doubt, so. That makes it a much more difficult remedy than the typical injunction action. But there's still civil remedies and other things available. Thank you, counsel. Not yet. We're going to hear from Mr. Kneedler first. He may have something you'd like to respond to. Mr. Kneedler. Mr. Chief Justice, and may it please the Court. I'd like to respond at the outset to the suggestion that this Court might modify the categorical rule in Kiowa that an Indian tribe is subject to suit only if Congress unequivocally consents in order to allow suits by States. First of all, both Puyallup and Pottawatomie were suits by States for prospective injunctive relief, and the Court found them barred. Puyallup was off reservation. But there's another point that I think ties in with what the question's about foreign sovereign immunity. In this Court's decision in Blatchford, the Court held that the State of Alaska could not be sued by an Indian tribe, complaining about the distribution of State — some State funds in Alaska, which does not have Indian country. The Court held that the suit was barred. In doing so, the Court recognized that the Eleventh Amendment had originally been understood to bar suits only by individuals. But relying on this Court's decision in Principality of Monaco, the Court said that the Eleventh Amendment also bars suits by foreign sovereigns. And the Court's rationale in Principality of Monaco was that foreign sovereigns were not parties to the Convention. There was no reciprocal abrogation of immunity between foreign sovereigns and States. And in fact, the Court specifically pointed out that the State of Mississippi could not sue Monaco. And in this case, Monaco could not sue Mississippi. The Court applied that very same reasoning in Blatchford to an Indian tribe. The Court said, we have held in the past that Indian tribes may not be sued, and they cited Puyallup, which was a suit by a State. And the Court said, logically, it follows that a tribe may not sue a State or a foreign sovereign. Breyer, you're prepared to live with the following. Is it the case that if California opens a business in a commercial activity in 20 other States, at least one of which it's totally illegal, this other State, say, Utah, cannot can sue California or not? What's the answer? The State where that gaming occurs can, but that's because of Nevada v. Hall, where the Court drew a distinction between the first States. In the States, there was a sovereign guarantee. Breyer, what the opposition says in your view is absolutely correct, that a foreign nation opens up an illegal business in a State, the State can sue them, now because of a treaty, but previously because of the common law you've made it to. California opens up an illegal business, the State can put them out of business by bringing a suit, but an Indian tribe, they can't. That's the United States' view. California, in the State-to-State situation, it is because of the reciprocity of the State. Breyer, I'm saying that is your view, though. I just want the bottom line. Yes, but let me, if I may explain, it's important to understand the reasoning. The reason why a suit by a State against a sovereign would now be okay is because of the Foreign Sovereign Immunities Act. As I mentioned with the Principality of Monaco, part of what the Court said there is the State could not sue the Principality of Monaco because, at the time, there was no abrogation of immunity. Foreign sovereign immunity might, what's first, correct. Scalia, that statute was based upon judicial decisions that had already held that. With all respect, Justice Scalia, it was based upon the executive branch's determination in the Tate letter. In this Court's decision in Republic of Mexico v. Hoffman, the Court said it is not for the courts to deny an immunity that the government recognizes. Prior to 1952, when the United States adopted the restrictive theory of sovereign immunity, foreign sovereigns were absolutely immune from suit unless the political branches said otherwise. In the Tate letter, the executive branch adopted what was the developing body of international law for foreign sovereign immunity and said that commercial activities could be the subject of suit. That was codified, but the Court did not take it upon itself to modify that foreign sovereign immunity. And this is the point that the Court made in Kiowa. Scalia, it took it upon itself to accept the executive's determination of how it ought to play out. Well, yes, but it didn't treat it just as a matter of common law, like a maritime common law claim or something like that. It treated it as structural under the Constitution. And the same thing is true of Indian tribes. The Constitution refers to Indian tribes. Worcester v. Georgia announced that Indian tribes are sovereigns. We made treaties with sovereigns. They were recognized. Roberts. They are quasi-sovereigns. Dependent sovereigns. Which means dependent sovereigns. Yes, but it's surprising that the scope of their immunity exceeds that of States or foreign sovereigns. They are dependent sovereigns, but they are dependent upon the plenary power of Congress. Well, that's not by the plenary power of this Court's common law immunity rule. So the Federal government can certainly take enforcement action against this casino. Yes. And the Federal government, if the solicitor of interior has said these are not Indian lands, the NIGC has adopted that interpretation. The NIGC has said, but we can't do anything because they are not Indian lands. We work on Indian lands. And then they have referred, as I understand it, the matter to the U.S. attorney, who has thus far not done anything. Right? Well, because so basically, as I see it, the Federal government is saying, States, you can't take action against this illegal casino. We are the only ones who can. We agree that it's illegal, but we are not going to do anything. No, but we are, first of all, by the casino was promptly closed and whether it would have been a prudent exercise of Federal criminal prosecutorial authority or civil  States. Who made these Indian tribes sovereign? Was it Congress? The Constitution. I mean, you are appealing to, you know, other branches' determination. Who decided that Indian tribes are sovereign? The Constitution by in the Congress clause. Who pronounced them to be sovereign? This Court. This Court. But it, but it. So I assume that this Court could also determine the scope of their sovereignty. But this Court did not do it as a matter of common law. It did it by looking to the Constitution. We have treaties with Indian tribes. We have the Commerce Clause. Scalia. Scalia. We do virtually nothing as a matter of common law. We do, we do virtually everything on the basis of the Constitution or, or statutes. I don't think that that's much of an exception. As this Court said in Lara, it is a general proposition that diminishment of tribal sovereignty is for the political branches. The Court said that in Lone Wolf. Why? Because you are representing the United States. You have, you understand the Indian policy. This case has tremendous implications if we follow your approach. It seems to me well beyond anything to do with gaming. My belief is Indian tribes all over the country operate businesses off the reservation and businesses all over the country are regulated. And does the State, I guess in your view, does not have the power to enforce the regulation against the Indian tribe? Why is that in the, against the tribe itself? Why is that in the Indian tribe's interest? And is it a trap for the unwary lawyer? And, and how is this supposed to work out in your view? Well, Congress has addressed this problem in numerous ways. For example, the and, and in deciding whether to abrogate immunity, there are complex decisions. Should it be under tribal law? Should it be under State law? Should it be under Federal law? Should the suit be in Federal court? Should it be in State court? What about a private? What about private individuals who may have a claim against, as a result of the operation of the casino? Vendors who want to be paid, somebody who slips and falls. That's all barred by sovereign immunity? Unless, unless the tribe consents. As, as the two of the amicus briefs point out, a number of the tribal compacts provide for waivers of sovereign immunity for tort claims that may arise out of a, out of a gaming operation. Contract claims could be, could be brought in tribal court. Justice Alito's question was the Kiowa case. It was off-reservation. The tribe owed money on a contract, which it refused to pay, and the Court said sovereign immunity. Exactly. And I should also point out that the Court said in Kiowa, in addition to reaffirming this analysis that I described from Blatchford and Coeur d'Alene Tribe v. Idaho, the Court reaffirmed that reciprocity and principality of Monaco point. But it also pointed out the tremendous reliance interests that have grown up on, on the basis of foreign sovereign immunity. It pointed out that, for example, 450N of Title 25, which specifically preserves immunity, something that was reiterated in the No Child Left Behind Act. But it also specifically pointed out that Congress has sometimes created narrow exceptions to the immunity. And critically, one of the ones it cited was the very one on which Michigan is relying in this case, 2710d7a2. That is a limited exception for injunctive actions by a State against a tribe. I'm not suggesting that the Court should have a narrow exception to that. Ginsburg. You went through the development of the foreign sovereign immunity, and whether the courts were influenced by the government, it was the courts that recognized this distinction between commercial activity and governmental activity. Why couldn't the Court extend that same distinction? It makes sense in the foreign country context. It also makes sense in the context of the tribes, the distinguished commercial from governmental. It may well not make sense, or it may not lend itself to one answer, for the reasons that I said. Congress, for example, when it comes to tort claims against tribes, adopted a provision making the United States liable for tort claims and not others. It may not lend itself to one principal answer, which is why the Court in Kiowa said it's up to the legislature, the Congress, to weigh the various pros and cons, or up to the tribe itself in deciding whether to waive. Roberts. Thank you, Mr. Kneedler. Mr. Bursch, you have 5 minutes left. Bursch. Thank you, Mr. Chief Justice. I want to clarify just two things about the Court's precedent and then get back to the remedies issue, which has taken up so much of our time this morning. First, the State of the law when IGER was adopted in 1988, again, that was before Kiowa. I heard my friend on the other side talk about Puyallup and how that was an off-reservation case. And what you need to understand was that Puyallup was the third in a series of three opinions that this Court issued. And it's true that some of the earlier cases involved on and off-reservation conduct. But as we point out in our reply brief, this is at pages 167 to 68 of that opinion, here the tribe's contention was that the fishing activities on its reservation were immune. And Justice Stevens wrote that opinion, and then only a few short years later in Kiowa wrote his dissent where he said, we've never before drawn that on-off-reservation distinction. So that's what Puyallup says. With respect to Alfred Dunhill and the evolution of foreign sovereign immunity as a common law doctrine, four justices agreed or signed on to the entire opinion where that discussion was held. One justice agreed only with parts 1 and 2, but part 2 on page 694 draws the commercial line and says the problem here is that the district court found the only evidence of an active State, as opposed to a commercial Act, was a statement by counsel that the Cuban government and the interveners denied liability, and that's not enough. And the Court did reference the Tate letter, but that's not why the Court changed the common law of foreign nation sovereign immunity. It gave respectful consideration to the executive branch's views, and then it reached its own conclusion about what the common law should say. And, Justice Ginsburg, you're exactly right to say if it makes sense in the foreign nation context and it makes sense here, apply it to both. If we modified it to make an exception for commercial activities off-reservation, could Congress reinstitute sovereign immunity? No question they could. Just like when this Court in Cabazon said that States didn't have the regulatory authority they thought they did to regulate illegal gaming on reservation, and this Court said, you know, States can't really touch that, Congress immediately jumped in and corrected course. You know, conversely, with Alfred Dunhill, when this Court drew the line at commercial conduct, Congress immediately jumped in and it put a stamp of approval on that and essentially adopted the line. Kagan. But there seems something sort of strange about that, General, because as I read Kiowa, what it was was an invitation to Congress. It was saying, you know, we have some concerns about this, we're not sure it makes sense, we are dropping a very broad hint that Congress should change it. And 15 years later, Congress has done nothing. And then to come back 15 years later and to say, you know, Congress didn't really accept our hint, so we'll just do it ourselves and make Congress reverse it, wouldn't you think that that's a strange procedure to use? Actually, Justice Kagan, I think that's the way that the common law works, that the Court does extend invitations to the legislative and executive branches. Maybe we learned something in 15 years. I would think so. But maybe we learned that Congress thought that this did make sense. I think you could draw the conclusion either way. And the suggestion by the tribe and the government that somehow this Court lacks the power to define common law tribal immunity, we think does make sense. But I would have thought, General Bursch, that one of the principles behind Indian law in this country goes something like this. Congress can do pretty much whatever it wants with respect to Indian tribes, but we will not lightly assume that Congress means to undermine tribal sovereignty. We will insist that Congress says that before we put it into effect. And here, it's not just the – I mean, Congress has given every indication that it does not wish to change this, notwithstanding our hint that it should. I respectfully disagree. And the best evidence of that congressional intent is in IGRA itself, where Congress abrogated immunity even for on-reservation conduct. Think about what an extraordinary remedy that is, that even on the reservation, a State would have the ability to go into court and get a Federal injunction rather than send in police to arrest a member of the tribal tribe.   Now, I'd like to also add, General Bursch, to one thing, which is you've just heard, that the Indian tribes are in the same Eleventh Amendment-type position as the Principality of Monaco before the treaty. They didn't participate in the convention, and the Principality of Monaco was held to be immune, presumably even from commercial activity. Let Congress change it. That's what Kiowa says. Now, that, I think, is their basic argument, and if it's a wash, I mean, I hate to put it this way, because it sounds like a joke, but it isn't meant to be, in this case, if it's a wash, follow the precedent. I think Alfred Dunhill makes clear that this Court can change the stream of the common law when it comes to immunity. Really quickly on these remedies, a number of the things that we've talked about in the past. Sotomayor, you have remedies you don't like, but the waiver under IGRA is not for relief. You have that in Ex parte Young. Why are you asking us to waive sovereign immunity with respect to damages? I'll explain why, if I may answer the question. With respect to arresting Ex parte Young remedies, enforcing the arbitration and having them waive immunity, all these things are unclear whether they're available to us. And if this Court issued a definitive opinion that said we had each one of those remedies, that would do great good in this area. But the reason why we think that you should go farther than that is because if sovereignty means anything, it means allowing people to define what is illegal on their own lands, whether it's prostitution, gaming, or underage drinking, and being able to use the full enforcement power of the sovereign State, civil and criminal, to enforce those laws. Thank you. Roberts. Thank you, counsel. The case is submitted.